UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | No. 3:12-00048 |
| | ) | Judge Sharp |
| RICHARD OLIVE | ) | |

## MEMORANDUM

Pending before the Court is Defendant Richard Olive's "Motion to Dismiss or Strike the False Statements Alleged in Paragraphs 9(b), 9(c) and 10 of the Indictment" (Docket No. 20), to which the Government has responded in opposition (Docket No. 23), and Defendant has replied (Docket No. 24). For the following reasons, the motion will be denied.

## I. BACKGROUND

On March 1, 2012, a federal grand jury returned a nine count Indictment against Defendant, charging him with three counts of mail fraud in violation of 18 U.S.C. § 1341; four counts of wire fraud in violation of 18 U.S.C. § 1343; and two counts of money laundering in violation of 18 U.S.C. § 1957. The allegations in the Indictment span the period from late January 2006 until May 2007, and center around Defendant's role as president and executive director of the National Foundation of America ("NFOA"), a corporation.

According to the Indictment, NFOA claimed to be organized to provide charitable and humanitarian aid to numerous listed philanthropic causes but, in actuality, was geared towards defrauding owners of annuities. As a part of the alleged scheme to defraud, Defendant filed paperwork with the State of Tennessee to create NFOA as a nonprofit corporation. Thereafter, Defendant, "through highly compensated insurance agents across the country, offered and sold

1

investment contracts labeled as NFOA's 'Installment Plan Agreement[s]'" that were marketed essentially as charitable gift annuities. (Docket No. 1, Indictment ¶ 8).[1]

To induce annuitants and other potential customers to transfer assets to NFOA, the Indictment alleges that Defendant "and others acting on his behalf made various misrepresentations or material omissions with the intent to defraud." (Id. ¶9). So far as relevant to the present motion, these include representations that NFOA was a non-profit and charitable foundation under the Internal Revenue Code, and that Defendant's failure to disclose to potential customers that NFOA had been subjected to cease-and-desist letters from several states.

Through the alleged scheme, Defendant is alleged to have received "approximately $20 million, a portion of which he, intentionally and with the intent to defraud, took to further the scheme and for his and others' personal benefit." (Id. ¶ 12).

## II. DISCUSSION

Prior to discussing the substance of Defendant's motion, the Court notes that the Government spends a good deal of time in its response brief arguing why the Indictment should not be dismissed. This is understandable given that the motion is styled a "Motion to Dismiss or Strike." However, the caption of the motion goes on to state that it is directed to certain paragraphs, and both the introductory and concluding paragraphs indicate that Defendant is moving to dismiss or strike certain language in the Indictment, not the entire Indictment itself.

Regardless, insofar as Defendant's motion could be construed as a request for dismissal, the same will be denied because, even without the challenged language, sufficient factual allegations

---

[1] According to the Indictment: "A charitable gift annuity is a contract under which a charity receives cash, marketing securities, or other assets from a donor in return for agreeing to pay a fixed amount of money over a period of time to the donor-annuitant or their designated beneficiary. In a legitimate charitable gift annuity, the donor-annuitant can also receive a partial tax deduction under federal tax law." (Id. ¶ 5).

exist to support the charges of mail fraud, wire fraud, and money laundering, and Defendant makes no argument supporting dismissal of the Indictment. See, United States v. Coss, 677 F.3d 278, 287 (6th Cir. 2012) (citation omitted) ("[A]n indictment is sufficient if it, first, contains the elements of the offense charged and fairly informs a defendant of the charge against which he must defend, and, second, enables him to plead an acquittal or conviction in bar of future prosecutions for the same offense"). Accordingly, the Court construes Defendant's motion as one seeking to strike language from paragraphs 9(b), 9(c) and 10.

Rule 7(d) of the Federal Rules of Criminal Procedure provides that "[u]pon the defendant's motion, the court may strike surplusage from the indictment or information." Fed. R. Crim. P. 7(d). "The advisory committee's notes state that '[t]his rule introduces a means of protecting the defendant against immaterial or irrelevant allegations in an indictment or information, which may, however, be prejudicial.'" United States v. Laurienti, 611 F.3d 530, 546 (9th Cir. 2010) (quoting, Fed. R. Crim. P. 7(d)). Thus, "'[t]he purpose of a motion to strike under Fed. R. Crim. P. 7(d) is to protect a defendant against prejudicial or inflammatory allegations that are neither relevant nor material to the charges." Id. at 546-47 (citation omitted).

"The decision whether to strike language from an indictment rests within the sound discretion of the district court." United States v. Emuegbunam, 268 F.3d 377, 394 (6th Cir. 2001). A motion to strike surplusage should be granted only where it is clear that the language is irrelevant and prejudicial. United States v. Moss, 9 F.3d 543, 550 (6th Cir. 1993). This has been characterized as "a most exacting standard," United States v. Brye, 318 Fed. Appx. 878, 880 (11th Cir. 2009) (citation omitted), and, therefore, "[i]f the language in the indictment is information which the government hopes to properly prove at trial, it cannot be considered surplusage no matter how

3

prejudicial it may be (provided, of course, it is legally relevant)." Moss, 9 F.3d at 550.

## A. Tax Exempt Status Language

"In order to qualify for a tax exemption under 26 U.S.C. § 501(a), an organization must meet the qualifications laid out in § 501(c)(3)." Asmark Institute, Inc. v. Commissioner, 2012 WL 2550474 at *3 (6th Cir. July 30, 2012).[2] "The entity must be (1) organized and operated 'exclusively' for a tax-exempt purpose, and (2) have no part of its net earnings inure to the benefit of any private shareholder or individual." Id. (citation omitted). "Notably, donations to 501(c)(3) organizations are tax-deductible[.]" Christian Coalition of Florida, Inc. v. United States, 662 F.3d 1182, 1191 n.9 (11th Cir. 2011).

The Indictment in this case contains language alleging that Defendant misrepresented the tax exempt status of NFOA. Specifically, paragraphs 9(b) and 10 (with the language Defendant seeks to strike in boldface) read as follows:

> 9. (b) Throughout the entire scheme, Richard Olive and others acting on his behalf **falsely represented to annuitants and other potential customers that NOFA was a non-profit charitable foundation recognized under the U.S. Internal Revenue Code for which contributions were tax deductible**. Specifically, OLIVE falsely represented that NFOA was tax exempt under 501(c)(3) of the Internal Revenue Code. As OLIVE well knew, NFOA was not tax exempt under section 501(c)(3). Rather at all material times NFOA only had a pending application for 501(c)(3) status and that application was later denied in February 2008.
>
> 10. It was further a part of the scheme that Richard Olive **falsely represented to administrators of existing annuities that NFOA was a recognized charitable tax-exempt foundation under the Internal Revenue Code** in order to avoid required income tax withholding and to receive additional funds.

(Docket No. 1, Indictment ¶¶ 9(b) & 10, emphasis added).

---

[2] "The term 'exclusively' is 'a term of art' that does not require the entity to operate solely for tax-exempt purposes," but does require "that 'not more than an insubstantial part of an organization's activities [can be] in furtherance of a non-exempt purpose,'" and thus, "an entity is not exempt if it operates for 'any substantial noncharitable purpose.'" Id. (citation omitted).

Defendant asserts the statements that NFOA was tax exempt were true, writing:

> NFOA was a non-profit charitable foundation. As the Indictment alleges, and is the fact, NFOA was registered as a non-profit corporation under Tennessee law. (Indictment, ¶7) As the Indictment also alleges, and is the fact, NFOA filed an application for recognition as a tax exempt entity under Section 501(c)(3) in January 2006, and the Application was pending during the entire period NFOA sold installment plans from January 2006 to May 2007. (Indictment, ¶9.b) As the Indictment further alleges, and is the fact, the IRS denied NFOA's application in February 2008, nine months after NFOA's operations were shut down in May 2007 by the Tennessee Commissioner of Insurance. Thus, whether the alleged statements were false depends upon whether the applicable sections of the Internal Revenue Code and Treasury regulations can and should be interpreted as providing that NFOA was recognized as a tax exempt entity under 501(c)(3) for which contributions could be deducted based upon its pending Application.

(Docket No. 20 at 3). Defendant goes on to argue that the tax code and accompanying regulations "make plain that upon filing its Form 1023[3] application on January 27, 2006, NFOA was a tax exempt organization for which contributions could be conducted," and neither the code or regulations "state that the application must be approved before the organization is recognized as tax exempt and contributions to it are tax deductible." (Id. at 7).

Conspicuously absent in the above excerpt from Defendant's brief is a citation to the Indictment for the proposition that NFOA was, in fact, operated a non-profit charitable organization. The Indictment suggests otherwise, characterizing NFOA at the outset as being "purportedly organized to provide charitable and humanitarian through various philanthropic causes," and later alleging that Defendant "obtained $20 million," at least some of which was used for his own personal benefit, or to further the scheme. (Docket No. 1, Indictment ¶¶ 1 & 12).

---

[3] "Form 1023 requires the organization to demonstrate that it is organized and operated exclusively for charitable purposes, and that any non-exempt purpose is incidental and not substantial to its operation. The IRS's initial determination as to whether an organization qualifies for tax-exempt status is based upon the information provided in Form 1023." United States v. Mubayyid 476 F. Supp.2d 46, 48-49 (D. Mass. 2007).

Defendant's premise – that NFOA was, in fact, a charitable organization – may prove to be wrong, and is something for the jury to determine. This potentially faulty premise also mandates denial of his Motion to Strike.

Defendant cites Section 501(a) for the proposition that tax exempt status is granted to an organization that files an application for such status "unless such exemption is denied." 26 U.S.C. § 501(a). However, that language must be read in context because the statute states that "[a]n *organization described in subsection (c)* . . . shall be exempt from taxation under this title unless such exempt is denied." Id. (emphasis added). Subsection (c), in turn, lists exempt organizations, including, so far as relevant to the Indictment, "[c]orporations . . . organized and operated exclusively for . . . charitable purposes, . . . no part of the net earning of which inures to the benefit or any private shareholder or individual[.]" 26 U.S.C. § 501(c)(3).

Defendant also cites Section 508(d) in conjunction with Section 508(a) for the proposition that a charitable organization is recognized and tax deductions are allowed upon the organization's filing of an application for exemption with the IRS.[4] Thus, according to Defendant, when NFOA filed its Form 1023 on January 27, 2006, it became a recognized charitable organization for which deductions were allowed, until the IRS denied its application in February 2008. In support of this position, Defendant cites Treasury Regulations, an IRS publication, a General Counsel Memorandum, and the treatment Defendant and his wife received from the IRS.

Defendant quotes language from Treasury Regulation 1508-1 as making "clear that an

---

[4] Section 508(a) provides that an entity "shall not be treated as an organization described in section 501(c)(3) – (1) unless it has given notice to the Secretary, in such manner as the Secretary may by regulations prescribe, that it is applying for recognition of such status[.]" 26 U.S.C. § 508(a)(1). Section 508(d) provides that "[n]o gift or bequest made to an organization shall be allowed as a deduction . . . , if such gift or bequest is made – (B) to any organization in a period for which it is not treated as an organization describe in section 501(c)(3) by reason of subsection (a)." 26 U.S.C. § 508(d)(2)(B).

organization is tax exempt upon giving the IRS notice by filing the Form 1023 application." (Docket No. 20 at 5). While the regulation does state that an "an organization . . . will not be treated as described in section 501(c)(3) . . . unless such organization has given the Commissioner notice in the manner prescribed," that same regulation also makes clear for purposes of the very same subparagraph that "an organization shall be considered organized on the date it becomes an organization described in section 501(c)(3) determined without regard to section 508(a))." 26 C.F.R. § 1-508-1(a)(I) & (iii). Further, while IRS Publication 526 does, as Defendant claims, inform taxpayers that they can deduct contributions to qualified organizations and that "[t]o become qualified most organizations . . . must apply to the IRS," that very same publication begins by informing taxpayers that "qualified organizations include nonprofit groups that are . . . charitable . . . ." IRS Publ. 526 at 1-2.

The General Counsel Memorandum upon which Defendant also relies does not establish that 501(c)(3) status and tax deductibility is assured upon the mere filing of an application. In the Memorandum, the General Counsel addressed "the question whether an organization would be permitted to claim 'church status' after it had a applied, using Form 1023, for recognition of exemption under I.R.C. § 50l(c)(3), but the application was closed without the issuance of a ruling. . . ." GCM 37458 at 1 (March 14, 1978). After noting "that Section 508(a) requires only that a new exempt organization <u>notify</u> the Service that it is applying for recognition of its section 50l(c)(3) exempt status," General Counsel went on to observe that once an organization "gives proper notice under section 508(a), . . . the nature of the organization itself, rather than the determination of the Service, controls in determining whether the organization is exempt." Id. (emphasis added). As for the deductibility of contributions to organizations that have applied, but failed to establish

7

exempt status, General Counsel opined that "a deduction is not barred," and that "an individual contributor may be allowed to make a deduction if he can establish that the organization is a qualified donee," but, in doing so, reiterated that "it is the nature of the organization" that "controls." Id. at 2. This language, which Defendant quotes, seems to make clear that the real question is whether the applicant seeking the exemption is, in fact, a 501(c)(3) organization for which tax deductions are allowed. Indeed, General Counsel in the Memorandum twice identified this as the "threshold test." Finally, Defendant argues "the best evidence that NFOA was tax exempt and that contributions to it were tax deductible is that in 2008 the IRS examined Mr. and Mrs. Olive's 2006 contributions to NFOA and accepted the tax deduction they took on their 2006 tax returns." (Docket No. 20 at 8). Leaving aside that the only thing supporting this "evidence" is Defendant's self-serving affidavit, the IRS's treatment of Defendant and his wife says nothing about (1) how others who claimed deductions have been or may be treated, (2) the IRS's position on whether NFOA was actually a 501(c)(3) organization; or (3) whether NFOA was actually operating as a charitably organization within the meaning of Section 501(c)(3).

Taken to its logical extreme, Defendant's ultimate position appears to be that, upon the filing of a Form 1023, an organization is entitled to exempt status, and contributions to that organization are automatically tax deductible, until the IRS issues an adverse determination. Under this theory, a wholly non-charitable organization, say "Seminole Bingo" or "Joe's Garage," could seek and receive non-taxable charitable contributions from the public merely upon filing a Form 1023, and continue to do so, until the IRS was able to ferret out that the former was actually a gaming parlor and the latter a car repair shop. The Court does not read the relevant statutes or regulations as sanctioning that possibility. Accordingly, Defendant's Motion to Strike the language in the

8

Indictment relating to tax exempt status will be denied, particularly since the Indictment acknowledges that an application for 501(c)(3) status was pending before the IRS during all relevant times. (Docket No. 1, Indictment ¶ 9(b)).

**B. Cease and Desist Letters**

Defendant also seeks to strike language in the Indictment relating to NFOA's receipt of cease-and-desist letters from state regulators as set forth in paragraph 9(c) which reads:

> 9. (c) Throughout the entire scheme, Richard Olive and others acting on his behalf failed to inform annuitants and other potential customers that NFOA was subject to cease-and-desist orders issued by several states that ordered NOFA to stop selling installment plans.

Id. ¶ 9(c). According to Defendant, the states of Washington, Florida, Texas, California and Alabama issued cease and deist orders various dates, and NFOA stopped selling in those states immediately upon receipt of the orders.

Defendant relies upon Langsford v. Ride Aide of Alabama, Inc., 231 F.3d 1308 (11th Cir. 2000) for the proposition that "absent an allegation of a legal duty to make disclosure of the orders, there is no violation of the mail and wire fraud statutes for failing to do so." (Docket No. 20 at 9). How Langsford ultimately aids Defendant is unclear because, after holding that "it would be an error to find that a duty to disclose information for purposes of the federal mail and wire fraud statutes can only be found where a statute, regulation, or formalized legal relationship between the parties expressly delineates such a duty," the Eleventh Circuit went on to observe:

> . . . Plaintiffs are correct in their assertion that concealment of critical data, even without a formalized duty to disclose that data, can constitute mail and/or wire fraud in certain situations. Schemes to defraud can take many forms – criminal ingenuity is an amazing, if disturbing, thing to behold. It would be unduly constrictive to hold that a duty to disclose can only exist where it is statutorily or contractually implied; the complexity of transactional relationships is such that duties to disclose may exist in other situations if the transaction is to be legitimate. We can envision many

9

situations in which a failure to disclose information could constitute fraud pursuant to 18 U.S.C. §§ 1341 and 1343, even when no duty to disclose exists independently.

Id. at 1312-13; see also, United States v. Sumeru, 449 Fed. Appx. 617, 622 (9th Cir. 2011) (citation omitted) ("'even in the absence of a trust relationship, a broker cannot affirmatively tell a misleading half-truth about a material fact to a potential investor'" because "[t]he duty to disclose in such circumstances 'arises from the telling of a half-truth, independent of any responsibilities arising from a trust relationship'").

Regardless, the existence of the cease and desist orders may be admissible at trial, even in the absence of a duty to disclose. In this regard, such evidence may go to motive, knowledge and/or intent and, therefore otherwise be relevant. See, United States v. Dupree, 2011 WL 3235763 at *5 n.1 (E.D.N.Y. July 28, 2011) (finding that while government could not rely on existence of court order regarding the depositing of funds to support charge of defrauding financial institution, language relating to that order would not be stricken from indictment where it was "potentially relevant to show defendant['s] knowledge and intent"); United States v. Johnson, 262 F.R.D. 410, 414 (D. Del. 2009) (refusing to strike language even though "it may not be essential to the Indictment's specific charges," because it was "generally relevant to the fraudulent schemes alleged by the Government" and language could be "relevant for showing the Defendants' fraudulent intent").[5]

---

[5] In his response brief, Defendant argues that if the Government intends to rely upon the cease and desist orders as Rule 404(b) evidence, it was incumbent upon the Government to so notify Defendant within fourteen days of the arraignment as required by Local Criminal Rule 16.01(h). Even so, the Local Rules do not speak to whether the language should be striken. If the notice issue is something which needs to be addressed, it is something that can be raised by separate motion. See, United States v. Allen, 2012 WL 4174894 at *4 (M.D. Tenn. Sept. 19, 2012) ("The Defendants may raise any objection based on a lack of notice regarding a specific item of Rule 404(b) evidence at the appropriate time").

## III. CONCLUSION

On the basis of the foregoing, Defendant's "Motion to Dismiss or Strike the False Statements Alleged in Paragraphs 9(b), 9(c) and 10 of the Indictment" (Docket No. 20) will be denied.

An appropriate Order will be entered.

_____
KEVIN H. SHARP
UNITED STATES DISTRICT JUDGE