UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| UNITED STATES OF AMERICA | ) | |
|---|---|---|
| | ) | |
| v. | ) | No. 3-12-cr-00048 |
| | ) | |
| RICHARD OLIVE | ) | |

## MEMORANDUM OPINION AND ORDER

Richard Olive has filed a *pro se* Motion for Compassionate Release (Doc. No. 165), supplemented by court-appointed counsel (Doc. No. 177), to which the Government has filed a response in opposition. (Doc. No. 178). For the reasons that follow, both Motions will be denied.

In its discretion, a court may grant compassionate release from prison where there exists an "extraordinary and compelling reason" for that release, and it is otherwise appropriate in light of the "applicable Section 3553 factors." United States v. Jones, 980 F.3d 1098, 1107–08 (6th Cir. 2020). A court must address both factors when granting relief, but need not do so if one of those factors indicates that relief is not warranted. United States v. Ruffin, 978 F.3d 1000, 1006 (6th Cir. 2020).

The statute does not directly define "extraordinary and compelling" circumstances. Most of the time, courts find that such circumstances exists where the inmate has a medical condition that the Centers for Disease Control has identified as placing an individual at an increased risk of severe illness or death were he or she to contract COVID-19. This is based upon commentary by the Sentencing Commission that indicates "extraordinary and compelling" circumstances can include serious physical or medical conditions, and the diminished ability to provide self-care in a prison environment. U.S.S.G. § 1B1.13, comment n.1(A). Beyond that, "district courts have discretion to define 'extraordinary and compelling' on their own initiative." United States v. Elias, 984 F.3d 516, 519 (6th Cir. 2021).

This exercise of discretion is not unfettered or unbridled, however. Rather, "those words still have their 'ordinary meaning at the time Congress enacted the statute.'" United States v. Hunter, No. 21-1275, ___ F.4 ___, ___, 2021 WL 3855665, at *4 (6th Cir. Aug. 30, 2021) (quoting Wisconsin Central Ltd. v. United States, ––– U.S. ––––, 138 S. Ct. 2067, 2074 (2018)). "[W]hen Congress enacted the statute in 1984, 'extraordinary' was understood to mean 'most unusual,' 'far from common,' and 'having little or no precedent,'" while "'[c]ompelling' meant 'forcing, impelling, driving.'" Id. (internal citations omitted).

In both his *pro se* motion and the one filed by counsel, Defendant presents a laundry list of non-health related reasons why he should be released. His primary focus, however, is on two things: the work he has done in prison, and that he claims to be a changed man.

To his credit, Defendant is a Mental Health and Suicide Watch Companion in the Skills Program at the Federal Medical Center in Fort Worth, Texas. In these roles, he serves as a friend companion to inmates who are intellectually low-functioning or have mental health disorders, such as schizophrenia or bi-polar disorder. Defendant lives with those inmates and claims he is a "mentor," who attempts to "lead[] by example." (Doc. No. 165 at 6). He has received a Certificate of Appreciation from the Bureau of Prisons ("BOP") for his efforts. (Doc. No. 165-2 at 1).

In addition to his role as an inmate companion, Defendant leads Bible studies. This puts to use the "Diploma in Theology" he earned from the Covenant Bible College and Seminary in July 2015. (Doc. No. 165-2 at 6).

Previously, while at FCI-Coleman, Defendant was selected to participate in emergency situation response training at the prison. Defendant states very few inmates are selected for the program, and this shows he is "viewed, respected, and valued by the staff and inmates." (Doc. No.

165 at 7).

Defendant also claims to be "a God[-]fearing man that continues to move forward with [his] faith and [his] desire to give back to others." (Doc. No. 165 at 7). He argues that his "rehabilitative efforts while incarcerated, and [his] efforts giving back to others . . . prove that [he] ha[s] the motive and desire to live a productive and purpose-driven life." (Id. at 6). Defendant additionally claims to have "accepted responsibility for his past criminal actions," and is "remorseful." (Id. at 9). Attached to his *pro se* motion are numerous letters from family and friends supporting his request for compassionate release. (Doc. No. 165-2 at 6-16). The Court has read and considered those letters.

The Court applauds Defendant's work and his attempts at self-improvement. Respectfully, however, the Court would be remiss if it neglected to state that it takes Defendant's word with a grain of salt. Although the undersigned was not his sentencing judge, the undersigned had the opportunity to observe Defendant and assess his credibility when considering his Section 2255 motion in November 2019. That opportunity was not favorable to Defendant in terms of his candor or truthfulness.

Some six years after sentencing, Defendant still had not credibly accepted responsibility for his criminal acts. The Court observed:

> At today's hearing, I further find that your demeanor did not reflect truthful testimony. Specifically, you were evasive. Your answers were self-serving. You were prideful. And you were very skilled at avoiding answers to the questions.
>
> Repeatedly throughout the hearing this morning, this afternoon, the Court had to remind you, "That's not the question I'm asking." Even on examination of your attorney, on direct examination, you had a tendency to say what you wanted to be said here today and not answer the questions. And the same was true on the government's cross-examination.

3

> And then, finally, quite frankly, the Court does not follow or appreciate your testimony that what was in your heart is somehow different from your intent to testify on the elements of the charges in the indictment. I think quite the contrary. In your heart of hearts, as your wife and son-in-law and you testified, you simply *had not accepted and have not accepted that you are guilty of any of the charges* in the indictment and on which the jury found you guilty.

(United States v. Olive, Case No. 3:17-cv-00979, Doc. No. 45, Tr. at 223) (emphasis added). The Court also found that Defendant was "very skillful, very artful in the choice of words and the ability to use words to [his] own advantage." (Id. at 224).

Perhaps Defendant has now come to grips with his criminal conduct, is genuinely remorseful, and intends to lead a law-abiding life. Hopefully that is the case. Even so, "Congress was emphatically clear that '[r]ehabilitation of the defendant alone shall not be considered an extraordinary and compelling reason.'" Hunter, 2021 WL 3855665, at *11 (quoting, 28 U.S.C. § 994(t)).

Recognizing as much, Defendant points to other factors that he claims warrant compassionate release in conjunction with his efforts at rehabilitation. These include:

- He is a first-time offender with little in the way of a criminal history, and his were non-violent, white-collar crimes. Nevertheless, he was sentenced to 372 months imprisonment.

- He is now 56-years old and Sentencing Commission statistics suggest very little likelihood of recidivism at that age.

- He tested positive for COVID-19 in September of 2020, and its effects have lingered, "to include continuing shortness of breath and fatigue which has not been abated following his recovery." (Doc. No. 177 at 3).

- His age and/or having had the coronavirus places him "at increased risk of sickness and death as a result of the continuing pandemic," and "overcrowding in the prisons will continue to make those who are of advancing age and medically fragile less able to survive the virus." (Id. at 2). "Reduced access to quality medical care and poor quality nutrition will further increase those who are likely to contract the virus and

develop lingering medical complications as a result of the infection." (Id. at 2-3). Defendant's arguments overlook several important things.

Even though he is in his mid-fifties, the medical record from the BOP suggests that he is in good health. Moreover, being in prison at his age is hardly unique: almost 15% of the federal prison population is between the age of 51 and 60; and there are 8,574 federal prisoners between the age of 56 and 60. See, www.bop.gov/statistics_inmate_age (all websites last visited on 9/15/2021). Defendant's suggestion that he is in an overcrowded prison is not supported by the record, and his claim of access to quality medical care ignores that he is housed in a federal medical facility.

Further, Defendant's medical records do not support his claim of lingering medical conditions after he tested positive for COVID-19 on September 21, 2020. Initially, he was asymptomatic. (Doc. No. 180-3 at 17). A week later, on September 28, 2020, he reported that he felt mildly ill with loss of taste and smell, and mild fatigue, but he told the medical staff that those symptoms "were improving." (Id.). He denied having a "fever, chills, sweats, sore throat, headache, muscle/body aches, congestion or runny nose." (Id.). Defendant was placed in isolation for 10 days, and for each of those days he informed medical staff that he did not have any of the foregoing ailments or other symptoms commonly associated with COVID-19. (Id. at 1-19). Thereafter, in follow-up medical screenings on January 25, 2021, and on again on February 10, 2021, Defendant reported no "cough, shortness of breath, fatigue, body aches, sore throat, diarrhea, headache, loss of taste or smell, nausea or vomiting." (Doc. No. 180-1 at 32, 33).

At best, Defendant has established a generalized fear about catching the coronavirus but that is hardly uncommon and not a basis for granting relief. See United States v. Bothra, No. 20-1364, 2020 WL 2611545, at *2 (6th Cir. May 21, 2020) ("Courts have been reluctant to find that

5

generalized fears of contracting COVID-19, without more, constitute a compelling reason."); United States v. McGlother, No. 3:18-CR-00202, 2021 WL 3490026, at *4 (M.D. Tenn. Aug. 9, 2021) (quoting Bothra and stating that "Defendant's general fear of a COVID-19 re-infection, even if Defendant is still experiencing symptoms of his first infection as he claims, is not an extraordinary and compelling reason for compassionate release"). Besides, any fears this particular Defendant may have should be greatly reduced for three reasons.

First he has already had COVID-19, meaning that his body has likely developed antibodies that offered some protection. (www.nih.gov/news-events/lasting-immunity). Second, he has been fully vaccinated, having received the first dose of the Pfizer vaccine on April 12, 2021, and the second dose on May 5, 2021 (Docket No. 180-2 at 12). See, United States v. Jackson, No. 3:11-CR-00138, 2021 WL 1721427, at *2 (M.D. Tenn. Apr. 30, 2021) (stating that "[t]he Pfizer vaccine is believed to be 95% effective in preventing COVID-19, '[i]n clinical trial the vaccine was 100% effective in preventing severe disease,'" and collecting cases for the proposition that most courts will not find extraordinary and compelling circumstances where an inmate has been fully vaccinated.). Third, at the Fort Worth-FMC where Defendant is housed, there are presently no reported cases of COVID-19 among inmates or staff, and 1,105 of 1,329 (83.3%) of the inmates have been vaccinated. (www.bop.gov/coronavirus).

Finally, Defendant suggests he presents extraordinary and compelling circumstances because he was sentenced to 372 months in jail, whereas, the mean federal sentence for murder is 224 months; for sexual abuse it is 137 months; and for drug traffickers it is 70 months. (Doc. No. 165 at 10). Assuming Defendant's figures are accurate, he points to no retroactive changes in the sentencing laws that would require a lower sentence, and "facts that existed when the defendant was

6

sentenced cannot later be construed as 'extraordinary and compelling' justifications for a sentence reduction." Hunter, 2021 WL 3855665 at *4.

Because Defendant has failed to establish extraordinary and compelling circumstance for compassionate release, the Court could simply deny his motions on this basis alone. Regardless, the applicable Section 3553(a) factors do not warrant release, either.

Defendant was convicted on three counts of mail fraud, four counts of wire fraud, and two counts of money laundering. Those charges arose from his founding and serving as president of the National Foundation of America ("NFOA").

NFOA was a family business (he, his wife, and two step-daughters drew salaries), and purported to be a charitable organization that supported humanitarian services. It was not. Instead, by using "highly compensated insurance agents across the country," NFOA offered and sold investment contracts called "Installment Plan Agreements." United States v. Olive, 804 F.3d 747, 751 (6th Cir. 2015). "NFOA's primary business was exchanging a customer's existing annuity for one of the company's installment plans, which promised higher returns." Id. Those returns were never realized, however. Instead, the turned-over annuities were surrendered early (resulting in a substantially lower cash payout), and the funds received were utilized to pay salaries, fund family excursions, and purchase real property, including "a Jiffy Lube franchise in Georgia, land in Tennessee that included a cell phone tower, an office condominium in Franklin, Tennessee, and a condominium in Las Vegas, Nevada," id. at 752, among other things.

During its existence, NFOA solicited approximately $30 million in assets from almost 200 victims. (Doc. No. 111, Presentence Report at ¶ 16). Most of the victims were elderly, with an average age of 77. (Id. ¶ 17). All totaled the victims lost close to $6 million. (Id. ¶ 19).

7

Case 3:12-cr-00048   Document 181   Filed 09/22/21   Page 7 of 8 PageID #: 3471

Based upon the amount of loss, the vulnerability of the victims, and Defendant's leadership role, Judge Kevin H. Sharp sentenced him to the previously mentioned 372 months. This was indeed a stiff sentence, but significantly below the 106-year Guideline sentence and the one recommended to Judge Sharp by the probation office. (Id. at 25).

Defendant has been in prison for approximately 103 months and, with good time credit, has a projected release date of August 1, 2039. (Doc. No. 178-1 at 1). This means he has served a little over a quarter (27.688%) of the sentence imposed. Allowing compassionate release would thwart the sentencing goals of just punishment and the need for deterrence, both general and specific. It would also not promote respect for the law. The Court reaches this conclusion even considering that Defendant has remained discipline-free in prison, appears to have adjusted well, and serves as a companion to less fortunate inmates.

Accordingly, Defendant's Motion (Doc. No. 165) and Supplemental Motion (Doc. No. 177) for compassionate release are **DENIED.**

IT IS SO ORDERED.

_____
WAVERLY D. CRENSHAW, JR.
CHIEF UNITED STATES DISTRICT JUDGE