UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| UNITED STATES OF AMERICA, | ) |
| --- | --- |
| Plaintiff, | ) |
| v. | ) No. 3:12-cr-00048 |
| RICHARD OLIVE, | ) |
| Defendant. | ) |

## MEMORANDUM OPINION

Before the Court is Defendant Richard Olive's Motion for a Sentence Reduction Under 18 U.S.C. § 3582(c)(1)(A) (Doc. No. 188). The Government responded in opposition because: (1) Richard does not have an extraordinary and compelling reason for relief and (2) the 18 U.S.C. § 3553(a) factors do not support early release. (Doc. No. 190). Richard filed a reply. (Doc. No. 193). There is no dispute that he has exhausted his administrative remedies as required. 18 U.S.C. § 3582(c)(1)(A). His motion is ripe for review. For the reasons that follow, the motion will be granted.

I.   FACTUAL AND PROCEDURAL BACKGROUND

In 2013, a jury found Richard guilty of three counts of mail fraud, four counts of wire fraud, and two counts of money laundering. Richard spearheaded a widespread fraudulent scheme related to his purported business, National Foundation of America ("NFOA"). United States v. Olive, 804 F.3d 747 (6th Cir. 2015). NFOA claimed to be a charitable organization supporting humanitarian services, but it was a family business. Id. at 751. NFOA used "highly compensated insurance agents across the country" to offer and sell investment contracts called "Installment Plan Agreements." Id. NFOA exchanged customers' existing annuities for one of the company's installment plans, promising higher returns that never realized. Id. Instead, NFOA cashed out

those annuities early (resulting in a substantially lower cash payout) and used the money to fund his lifestyle by paying salaries and purchasing real property. Id. at 752. As a result of this fraudulent scheme, NFOA solicited approximately $30 million in assets from almost 200 victims. (Doc. No. 111, Presentence Report at ¶ 16). The average age of NFOA's victims was 77. (Id. ¶ 17). All totaled the victims lost close to $6 million. (Id. ¶ 19).

At sentencing, Richard's offense level was 41 and his criminal history category was II. (Doc. No. 125 at 2). The guideline range was 160 years, representing the statutory maximum of each count. (Id.) The offense level was based on the amount of loss, the vulnerability of the victims and Richard's leadership role. (Doc. No. 111 at 11–15, Presentence Report). Former Judge Kevin Sharp varied downward from the guidelines and sentenced Richard to 372 months (31 years) in prison because the guidelines range was "too harsh" followed by three years of supervised release. (Doc. Nos. 127 at 52, 188-1 at 8). The Court also determined that Richard must pay 6 million dollars in restitution to the approximately 200 victims. (Doc. Nos. 124 at 6; 124-1 at 1–3). Richard challenged his conviction and sentence on appeal, and the Sixth Circuit affirmed both. United States v. Olive, 804 F.3d 747 (6th Cir. 2015).

In 2017, Richard petitioned this Court for habeas relief under 28 U.S.C. § 2255, which the Court denied. (United States v. Olive, Case No. 3:17-cv-00979, Doc. Nos. 1, 18, 41). The Court conducted an evidentiary hearing on his claim for ineffective assistance of counsel and denied it, in part, because he was not credible. (Id. at 2). Almost two years later, on April 9, 2021, Richard filed his first motion for compassionate release, which was supplemented by counsel. (United States v. Olive, Case No. 3:12-cr-00048, Doc. Nos. 165, 177). He argued that his rehabilitation in combination with his COVID-19-related medical conditions entitled him to release. (Doc. No. 177). Specifically, Richard argued that his "rehabilitative efforts while incarcerated, and [his]

efforts giving back to others . . . prove that [he] ha[s] the motive and desire to live a productive and purpose-driven life." (Id. at 6). Richard also argued that he has "accepted responsibility for his past criminal actions," and is "remorseful." (Id. at 9). In denying Richard's compassionate release motion, the Court noted that it took Richard's words with a "grain of salt" based on the lack of credibility in June 2019 during the hearing on Richard's 2255 motion. (Doc. No. 181 at 3). The Court also noted that Richard had not credibly accepted responsibility for his criminal acts six years after his sentencing. (Id.). The Court denied Richard's motion because he failed to establish extraordinary and compelling circumstances for compassionate release, and that the 3553(a) factors did not support his release. (Id. at 8).

A little over three years later, on March 15, 2024, Richard filed his second compassionate release motion now before the Court. Richard now asks the Court to consider his mother's medical condition, the absence of an available caregiver for her, and his rehabilitation efforts. Richard's mother, Bettye Olive is eighty-four years old and lives alone in Nashville, Tennessee. (Doc. No. 188-1 at 45, 54). In October 2023, she was diagnosed with metastatic cancer. (Doc. No. 188-1 at 2, 42–55). The cancer grew rapidly, and Bettye's doctors were considering conducting surgery in January or February 2024. (Id. at 2, 49). As a result, on December 8, 2023, Bettye wrote a letter requesting that the Court release Richard to care for her. (Id. at 2). She explained that she has two children: Richard Olive and Cheryl Simpson. (Id.). Cheryl cannot care for her because: (1) she lives 2,000 miles away; (2) is a tax agent from March through April and; (3) has other employment from May through December to care for her monthly expenses. (Id.).

In April 2024, Bettye was mobile, but struggled to drive herself to her doctor appointments without getting lightheaded and dizzy. (Doc. No. 193-1 at 1). Her conditions worsened after Richard's motion was fully briefed. On July 30, 2024, Dr. Kent Shih at Tennessee Oncology wrote

3

that Bettye's cancer relapsed, and she was debilitated. (Doc. No. 194-1 at 1). Dr. Shih requested Richard to come care for her as she only had three months to live. (Id.). On August 6, 2024, Dr. Jennifer Bess at St. Thomas Medical Group also wrote a letter stating that Bettye cannot care for herself and is being referred to hospice for end-of-life care with less than three to six months to live. (Id. at 2). Bettye's family members: daughter, and granddaughter have written letters in support of Richard's early release.

In December 2023, Cheryl requested that the Court release Richard to care for their mother because she cannot be a caregiver for her. Cheryl states:

> I have made our mother's mortgage payment since November 2018. My employment unexpectedly ended in April 2023. I have been receiving unemployment since June 2023 and have just this week received my last unemployment check. I began a small income tax business in January 2022, and I am dependent on that income to provide living expenses and to continue making the mortgage payment on the home where my mother lives. This income is seasonal from January through April 15th. As Bettye's surgery will most likely be scheduled at the end of December or early in January 2024, I cannot plan to be there to provide the care which she will need. Additionally, there may be ongoing care which will be required in the months and years following.

(Doc. No. 188-1 at 4).

On April 23, 2024, Cheryl wrote another letter explaining that her small business is her only source of income, and it would not be economically possible for her to move to Nashville. (Doc. No. 193-1 at 1). She writes:

> I wish from the bottom of my heart that I could be there to help, but I am two thousand miles away. In addition, I do not have the strength required to lift her or assist in picking her up due to soreness in my shoulder. I run a small business which is my only source of work right now and I cannot move to be near her as my income from that would be nonexistent. I wish that I could be there to take care of her but it is not economically possible for me. I am asking that you would allow my brother to be released so that he can live with her, providing care on a day-to-day basis in addition to providing transportation.

(Id.).

4

Richard's daughter, Victoria Olive, says she cannot care for Bettye either. (Doc. No. 193-1 at 3). She recently graduated from college and has already accepted a job in Florida, where she plans to move. (Id.). She cannot "uproot [her] life" to move to Nashville to care for her grandmother due to financial limitations. (Id.). Victoria believes her father has changed. In February 2023, she visited her father and noticed a difference in him. (Doc. No. 188-1 at 6). She described him as more peaceful, of greater understanding, and open-hearted. (Id.). She is not alone in the view that Richard has changed. Personnel at the Bureau of Prison ("BOP") concur that they observed Richard's rehabilitation efforts since his incarceration. (See Doc No. 188-1 at 12–14).

Three staff members at BOP support Richard's compassionate release motion. Richard's supervisor, R. Munoz, says that Richard is responsible and dependable at work and is a mentor and guide to the younger adults in custody. (Doc. No. 188-1 at 12). The Unit Counselor at Federal Medical Center, R. Garza, believes that Richard has shown "sincere responsibility towards his working habits, rehabilitative progress, and working with other inmate on a daily basis." (Id. at 13). Finally, the Senior Officer Specialist at Federal Medical Center, A. Escobedo writes that Richard is a respectful person towards staff and other inmates (id. at 14) and works every day without complaining and does what he is asked to do. (Id.).

Notably, the sentencing judge offers his opinion in a letter supporting his release. Former Judge Sharp opines that:

> At the time I issued a variance from the range provided by the Sentencing Guidelines because I viewed the Guidelines range in his case as too harsh. However, in hindsight I believe the sentence that I ultimately imposed to have been too harsh. I would change it if I could . . . Mr. Olive has served nearly eleven years of imprisonment, and I fully support a sentence reduction in this case so that Mr. Olive case care for his mother.

5

(Doc. No. 188-1 at 8).

Lastly, on January 27, 2024, Richard admits that it took him several years before he could accept that he broke the law. (Doc. No. 193-1 at 4). He says that he no longer minimizes his actions and takes responsibility for breaking the law. (Id.). He wants to use the skills he has learned in custody to change for the better. (Id.). Richard is employed at the Trust Fund department (Doc. No. 188-1 at 12) and serves as a Suicide Watch Companion in the Skills Program at Federal Medical Center in Fort Worth where he has received two Certificates of Achievement (id. at 34, 35) and a Certificate of Appreciation (id. at 33). He has also attended the Inmate Companion Training (id. at 39) and attained a diploma in Theology (id. at 36). He has not incurred any disciplinary infractions. Additionally, he has secured employment for when he is released. He will be employed as a Maintenance Keeper at CenterHouse, a transitional home in Nashville. (Id. at 4).

## II. LEGAL STANDARD

Courts generally lack "the authority to change or modify [a sentence, once imposed,] unless such authority is expressly granted by statute." United States v. Thompson, 714 F.3d 946, 948 (6th Cir. 2013) (citing United States v. Curry, 606 F.3d 323, 326 (6th Cir. 2010)). However, a court may grant compassionate release from prison if there is an "extraordinary and compelling reason" for that release, and it is otherwise appropriate in light of the 18 U.S.C. § 3553(a) sentencing factors. United States v. Jones, 980 F.3d 1098, 1100 (6th Cir. 2020). A court must address both factors when granting relief, but need not do so if one of those factors indicates that relief is not warranted. United States v. Ruffin, 978 F.3d 1000, 1006 (6th Cir. 2020).

In November 2023, Amendment 814 to the Sentencing Guidelines revised U.S.S.G. § 1B1.13 to expand the list of extraordinary and compelling circumstances. § 1B1.13. As relevant

6

here, the family circumstances expansion provides that: "incapacitation of the defendant's parent when the defendant would be the only available caregiver for the parent" may constitute an "extraordinary and compelling reason for release." § 1B1.13(b)(3)(C).

## III. ANALYSIS

### Extraordinary and Compelling Reason

Richard argues that he has an extraordinary and compelling reason for release because his mother is incapacitated, and he is the only available caregiver. (Doc. No. 188 at 5–8). The Government argues that Richard's family circumstances are not extraordinary and compelling. (Doc. No. 190 6–8). To support this argument, the Government relies on pre-Amendment 814 cases where, unlike now, a parent's incapacitation is enumerated as an extraordinary and compelling reason supporting sentenced reduction under 18 U.S.C. 3582(c).

It is clear that Richard's mother is incapacitated. "Incapacitation" within the meaning of § 1B1.13(b)(3) typically means that the individual is "completely disabled" and "cannot carry on any self-care" or "is totally confined to a bed or chair." See United States v. Steele, No. 1:20-cr-13-4, 2024 WL 1928945, at *3 (S.D. Ohio May 1, 2024) (quoting United States v. Jones, No. CR 13-252, 2021 WL 1060218, at *10 (W.D. Pa. Mar. 18, 2021)). Here, Bettye's condition satisfies that standard. Bettye has terminal cancer and cannot care for herself. She has been referred to hospice with three to six months live. The letter did not specify whether Bettye would receive hospice care at her home or a facility, such as a nursing home or hospital. Either way, Bettye cannot care for herself. She is incapacitated for purposes of § 1B1.13(b)(3).

Richard argues he is the only available caregiver for his mother because his sister, Cheryl, lives in California and her employment prevents her from being a caregiver. (Doc. No. 188 at 6). The Government argues that Richard is not the only available caregiver because Cheryl is an

7

available caregiver notwithstanding that she may not want to relocate or move her mother to California. (Doc. Nos. 190 at 8– 9; 193-1 at 3). The Government further argues that Victoria may also be an available caregiver. (Doc. No. 190 at 10).

Two district courts applying § 1B1.13 family-circumstances expansion held that a defendant was the only available caregiver even though other family members appeared able to provide some assistance. For example, in <u>Bennett</u>, the Ohio court found that defendant was the only caregiver for his mother when one sibling lived in a different state, two siblings were poor and unable to make the daily drive to care for their mother, and another sibling suffered from mental health issues. <u>United States v. Bennett</u>, No. 5:20-cv-00857 2024 U.S. Dist. LEXIS 3204, at *5–6 (N.D. Ohio Jan. 8, 2024). Similarly, in <u>Stokes</u>, the Court found that the defendant was the only caregiver for his physically disabled mother and intellectually disabled sister when other family members who lived in the same state were not available due to their work and familial obligations, and their own health issues. <u>United States v. Stokes</u>, No. 3:19-CR-307 (SRU), 2024 WL 216643, at *2 (D. Conn. Jan. 19, 2024).

Here, Cheryl is responsible for paying her bills and her mother's mortgage. She has two forms of income: (1) her seasonal tax business in California that ends in April and (2) other employment from May through December. Cheryl says she would lose her income if she moved to Nashville. Without that income, she cannot pay her bills or her mother's mortgage, resulting in financial ruin. This would be more than a mere inconvenience. Cheryl also claims that her physical condition prevents her from lifting and picking her mother up. Bettye cannot care for herself, so she needs someone who can assist her with her personal hygiene and daily living (feeding, dressing, grooming, and toileting). This likely will require lifting and picking Bettye up.

Cheryl is not an available caregiver like the family members in <u>Bennett</u> and <u>Stokes</u> because of her financial condition, employment, location, and physical condition.

Neither is Richard's daughter an available caregiver. Victoria graduated college three months ago and accepted a job in Florida. Her Florida residency in conjunction with her new job preclude her from moving to Nashville to care for her grandmother. Like the family members in <u>Bennett</u> and <u>Stokes</u>, Victoria is not an available caregiver because of her location and work obligations. Richard may not be the "only imaginable caregiver; it is sufficient that he is the only available caregiver." <u>United States v. Allison</u>, No. 2:21-CR-20436-TGB-EAS, 2024 WL 3012780, at *3 (E.D. Mich. Jun. 14, 2024). Thus, Richard has established an extraordinary and compelling reason for his release under § 1B1.13(b)(3)(c) because he is the only available caregiver for his incapacitated mother.

### 18 U.S.C. § 3553(a) Factors

The applicable 3553(a) factors also weigh in favor of Richard's release. There is no question that Richard committed a serious offense. He orchestrated a fraudulent scheme that stole millions of dollars and exploited approximately 200 elderly, vulnerable victims. Although the offense was serious, it was non-violent. It did not involve firearms or drugs.

There is a strong need to provide restitution to the 200 victims who were defrauded. Richard has already obtained employment for when he is released. So, he can start paying the 6 million dollars he owes in restitution to the victims if he is released early. Richard's case is unlike most cases. Remarkably, the sentencing judge wrote a letter supporting Richard's early release. Although the Government correctly points out that Judge Sharp's letter does not describe a legal basis to reduce Richard's sentence, the Court gives the letter some weight because Judge Sharp imposed Richard's sentence and now thinks it is "too harsh". (Doc. No. 188-1 at 8). As the

9

Case 3:12-cr-00048    Document 195    Filed 09/04/24    Page 9 of 11 PageID #: 3608

sentencing judge, Judge Sharp is familiar with Richard's case, aware of his crime, and all factors that contributed to his sentence.

Richard urges the Court to consider his rehabilitation efforts in the 3553(a) factors. The record shows that Richard has demonstrated significant rehabilitative progress by taking advantage of the resources in prison and participating in the programs available to him. The Government highlights that the Court previously noted that Richard was not credible when it considered his first compassionate release motion, relying on the Court's credibility determination at Richard's 2255 hearing. (Doc. No. 190 at 10–12), but that was three years ago. Richard now acknowledges that it took him several years to accept that he violated the law. He has done a lot of self-reflection over the last few years and now recognizes the wrongs he committed. The Court, however, is not only considering what Richard says, the Court is also considering what neutral objective BOP individuals have observed. Richard's supervisor, a Unit Counselor, and a Senior Office Specialist verify Richard's rehabilitation since 2021. The Court gives them great consideration because they observe Richard on a frequent basis overtime. They are in the best position to describe Richard's current status and transformation because they observe him firsthand. It is rare that BOP personnel support early release of individuals in custody, so this makes their opinion notable. Not only do these individuals describe Richard's work ethic, but they also speak to his character as a person. The Court will give less weight to his prior credibility issues now because three BOP individuals have certified Richard's transformation.

Richard is now 59-years old, so there is a low chance of recidivism. Richard's age, high-school education, and Criminal History Category II show that the risk of recidivism is low. See Report At A Glance: Recidivism & Federal Sentencing Policy, https://www.ussc.gov/sites/default/files/pdf/research-and-publications/backgrounders/RG-

10

Case 3:12-cr-00048    Document 195    Filed 09/04/24    Page 10 of 11 PageID #: 3609

recidivism-overview.pdf (explaining that the Sentencing Commission's study showed that age, education and low criminal history is associated with a low likelihood of reoffending). Furthermore, fraud offenders like Richard were least likely to be rearrested. Id. Thus, there is a less need to protect the public from further crimes of Richard. Judge Sharp concluded the same at Richard's sentencing. (Doc. No. 127 at 54).

## IV. CONCLUSION

For the foregoing reasons, the Court will grant Defendant Richard Olive's Motion for a Sentence Reduction Under 18 U.S.C. § 3582(c)(1)(A) (Doc. No. 188).

An appropriate order will be entered.

*WAVERLY D. CRENSHAW, JR.*
UNITED STATES DISTRICT JUDGE